[Crim. No. 20.   Fifth Dist.   Feb. 13, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. MANUEL F. ORTIZ, Defendant and Appellant.

Ben Curry, Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, Manuel F. Ortiz, appeals from a conviction of violation of section 4573.6 of the Penal Code; the information charges that he ". . . did wilfully and unlawfully have in his possession in the Merced County Rehabilitation Center, a drug, without the authorization of any

person in charge of the Rehabilitation Center.'' The record shows that he had almost completed his sentence of six months on a misdemeanor charge of having driven an automobile after his license had been revoked, when an undercover agent of the State Bureau of Narcotic Enforcement urged him to sell to him for 25 cents a number of tablets and capsules which a fellow prisoner had left in their joint locker previously. These tablets and capsules were not narcotics or hypnotics, but consisted of Darvon compound, a sedative, and Achromycin V, an antibiotic, which had been prescribed for a former fellow prisoner.

Section 4573.6 of the California Penal Code reads as follows: ''Any person having in his possession in any state prison, prison road camp, prison forestry camp, or other prison camp or prison farm or any place where prisoners of the State are located under the custody of prison officials, officers, or employees, or in any county, city and county or city jail, road camp, farm or any place or institution, where prisoners or inmates are being held under the custody of any sheriff, chief of police, peace officer, probation officer, or employees, or within the grounds belonging to any such jail, road camp, farm, place or institution, any narcotics, or drugs in any manner, shape, form, dispenser or container, or alcoholic beverage, without being authorized to so possess the same by the rules of the Department of Corrections, rules of the prison or jail, institution, camp, farm or place, or by the specific authorization of the warden, superintendent, jailer or other person in charge of the prison, jail, institution, camp, farm or place, is guilty of a felony.''

The first point raised by appellant is that the word ''drug'' has such diverse meanings that it is impossible to know what is referred to by the use of the word. The case of *People v. McCaughan*, 49 Cal.2d 409 [317 P.2d 974] held that the words ''harsh'' or ''unkind'' in connection with the misdemeanor attempted to be defined by section 361 of the Penal Code were so vague in meaning that men of common intelligence must necessarily guess at their connotation and differ as to their application. ■■■ In those circumstances the court held at page 414 that the first essential of due process of law was violated:

''A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it.''

▆▆▆ In the recent case of *In re Newbern*, 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116] it is said:

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids . . . "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." ' "

(See also 14 Cal.Jur.2d, Criminal Law, § 110, pp. 318-322; 22 C.J.S., Criminal Law, § 24(2), p. 62.)

If we examine various statutory enactments of the state defining the word "drug," we do find a great variety of meanings given to the word. Section 26200 of the Health and Safety Code thus defines drug:

" 'Drug' means (1) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3)."

According to the Agricultural Code, section 1095.2, " 'Drug' means any substance intended for use in the diagnosis, cure, mitigation, prevention, or treatment of disease, and any substance, other than food and water, intended to affect the structure or function of the body of any livestock."

Section 383 of the Penal Code defines the term "drug" as including ". . . all medicines for internal or external use, antiseptics, disinfectants, and cosmetics."

Appellant's counsel points out that if the definition used in the Health and Safety Code were applied to the offense here prosecuted, a man could be sent to state's prison because he possessed such common objects as tobacco, baking soda, tooth paste (if it contained any drug to fight decay), distilled water, cotton, bandages, even a needle and thread, and practically any other substance or object which might commonly be expected to be contained in the personal effects of a pris-

oner. Counsel for appellant further suggests that perhaps the word "drug" as used in section 4573.6 of the Penal Code means "narcotic drug," and he calls attention to the fact that in some dictionaries the word "drug" is defined as a narcotic. The difficulty with the argument is that it deals with hypothetical situations not present in the instant case. For under practically any definition of drug we would necessarily include the substances here in question. ■ It is well established that an attack on constitutional grounds upon a statute must be limited to a consideration of the facts as presented by the specific case, and courts will not take into consideration purely hypothetical situations which might conceivably render the statute invalid under other circumstances. Under the law we must hold against appellant as to this contention. (*In re Cregler,* 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]; *Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446, 468 [55 P.2d 177]; *Kershaw* v. *Department of Alcoholic Beverage Control,* 155 Cal.App.2d 544, 550 [318 P.2d 494].)

Webster's New International Dictionary of the English Language (3d ed. 1961) defines drug as follows: ". . . a substance used as a medicine, or in making medicines, for internal or external use. . . ."

What was said in the case of *People* v. *Garcia,* 1 Cal.App.2d Supp. 761, 765 [32 P.2d 445] in reference to the use of the word "drug" in the Pharmacy Act is applicable here:

"No express definition of any of these words is set forth in the statute, consequently they are to be understood in their usual, natural and ordinary sense. The word 'drug' is defined by Webster's Dictionary as follows: 'Any substance used as a medicine or in the composition of medicines for internal or external use,' . . . Like definitions are given in other dictionaries, and in 19 Corpus Juris, 766 (Drug), and 40 Corpus Juris, 626 (Medicine)."

■ The evidence in the present case shows that Darvon and Achromycin V are drugs, and the court correctly so instructed the jury. ■ The word "drug" as used in the code section in question, inasmuch as the Legislature did not specifically define the word in the section itself, must be understood in its ordinary and normal meaning, that is to say, medicines or the components thereof for internal or external use.

■ It follows that the court in defining "drug" to the jury erred by making the definition much too broad when

it stated: "Drug means (1) articles recognized in the official United States Pharmacopoeia and (2) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; (3) articles (other than food) intended to affect the structure of any function of the body of man or other animals; and (4) articles intended for use as a component of any article mentioned in this definition of the State of California (Section 26200, Health and Safety Code)."

In May of 1961 the defendant, Manuel F. Ortiz, was in the custody of the Sheriff of Merced County at the Rehabilitation Center, serving a six months' sentence for driving an automobile with a revoked license. Henry Lopez, an undercover agent for the Bureau of Narcotic Enforcement of the State of California, was in the same barracks by arrangement with the sheriff in order to find out whether anyone among the prisoners was dealing in narcotics. He stayed at the Rehabilitation Center approximately four days; he was given a bed in the same building as appellant, approximately 10 or 11 cots away. In order to gain appellant's confidence, Lopez represented himself as a narcotics user in a conversation which he struck up with appellant during a card game. The agent repeatedly asked Ortiz to get him some narcotics; the defendant said he did not have narcotics, but that he could get some pills which might be of help, and that he would sell them for a nickel apiece.

On May 17, 1961, Lopez approached appellant and told him that he was feeling low in spirits and would like to get 25 cents' worth of pills. The conversations were partly in English and partly in Spanish. Thereupon, the defendant went to a wooden locker, which was located between his bed and the bed of the next prisoner, took out a container and removed from it two plastic pill vials, which had no labels on them and were about an inch and a half in height. Each vial was approximately half full of tablets or capsules. Appellant asked Lopez which ones he wanted, and the agent said that he would like to have the "best ones" or "the ones that can get me high." Appellant opened one of the vials and gave Lopez four yellow tablets, and, according to the agent, stated, "These are phenobarbital, these are the best you can get here." Defendant denied having given any particular name for the tablets and testified he merely told the agent, ". . . just that they were pain killers, I told him." Lopez thereupon asked for additional pills, and the appellant opened the other

vial and gave him two capsules, a yellow and blue one and a pink and gray one. Afterwards, the appellant placed the vials back in the same container from which they had been taken.

Two State expert witnesses testified that none of the tablets or capsules contained any narcotics, and it was also established that they contained no hypnotics. The State chemist was unable to ascertain what the compound was in the four yellow tablets, but said that one of the capsules, a pink and gray one, contained a white, crystalline powder which consisted of dextropropoxyphene together with other substances, aspirin, phenacetin, caffein, that this particular compound is known as Darvon compound, and is prescribed by doctors as a pain reliever. The other capsule was yellow and blue; he analyzed it and found its contents to be tetracycline, commonly known as Achromycin V, an antibiotic substance. Neither of the two capsules contained any narcotics; they were drugs or medicines which would require a doctor's prescription.

The appellant testified that he never used any of the pills himself or in any way asserted possession over them. He was due to be discharged from custody on or about June 12, 1961. During the period of his incarceration there had been a locker between his bed and the next bed. It was originally made by a man named Pimentel, a prisoner, who had turned it over to appellant, and afterwards appellant had shared it with a man named Rodriquez, who slept in the next bunk. After Rodriquez left, one Balthazar used it jointly with appellant. There were always pills and medicines in the locker, but these medicines belonged to the former prisoner Rodriquez. When Rodriquez left the Rehabilitation Center he did not take his pills with him, but left them in the locker. After Rodriquez left, appellant had moved the vials with the medicines in them into a container which was also on the shelf in the locker; appellant kept his tobacco in the same container.

The medicines had been issued to Rodriquez by the hospital, to which he had been taken for treatment while in the Rehabilitation Center. Many of the men in the barracks had similar medicines which had been prescribed for them, which they did not take and which were in their possession in the barracks. Agent Lopez testified that he saw other pills in the barracks, in the possession of other prisoners.

Inspections were made by the sheriff's office at irregular intervals during the period of time when the medicines were in the locker, but in spite of the fact that many men had

medicines in their possession, and even though the inspections were for the purpose of finding objects which the men were not authorized to have, no medicines had ever been confiscated. Deputy Sheriff Robert Blythe testified that there were never any arrests, so far as he knew, of any men for having drugs of this kind in the barracks; that the prohibited items picked up on inspection consisted of knives, files, kitchen utensils and "contraband." He elaborated on this by stating:

"A. .... Things that they are not supposed to have. There are quite a few things that [they] are not allowed to have besides——

"Q. Anything else? A. Well, right offhand, I can't think of anything. Tools, we didn't like them to have knives particularly. Kitchen utensils they would take those and grind them up into knives and souvenirs and tools."

In his listing of prohibited items which were confiscated in the regular searches, Deputy Blythe did not mention drugs or medicines.

One of the elements of the offense of possessing drugs under section 4573.6 of the Penal Code is that the person so possessing them has not been ". . . authorized to so possess the same by the rules . . . of the prison or jail, institution, camp, farm or place, or by the specific authorization of the warden, superintendent, jailer or other person in charge of the prison, jail, institution, camp, farm or place, . . ." The prosecution called Deputy Sheriff Blythe as its one witness on this phase of the charge. He testified that he was at the Rehabilitation Center only on alternate days. He did not state specifically that permission was not given for the issuance of the medicine or its possession; and he gave no testimony as to the contents of the rules of the Rehabilitation Center; he mentioned that the rules were posted at one place in the camp, but no copy was introduced in evidence, and no statement of what they provided was made. Mr. Blythe, in effect, testified that medicines that were to be given to prisoners were held at the central desk at the camp and that pills for the day were issued to the specific prisoner. However, he also stated that the prisoners on occasion were permitted to go for treatment at the hospital and also, if their funds permitted it, that they were sometimes treated by private doctors. Mr. Blythe testified that his superior at the time was a Mr. Taylor and that there were two assistant superintendents. In view of the necessity of making positive proof that neither the rules nor the person in charge had given permission for the

issuance and possession of the drugs, there has been a failure of necessary proof on the part of the People.

The appellant contends that the following proposed instruction on entrapment offered by him should have been given:

"The law does not tolerate a person, particularly a law enforcement officer, generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime thus entrapping such person into the commission of a crime which he would not have committed or even contemplated but for such inducement; and where a crime is committed as a consequence of such entrapment, no conviction may be had of the person so entrapped as his acts do not constitute a crime.

"If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person acting with the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed."

It will be remembered that the question of whether or not the defendant previously had possession of the drugs was not conceded. He had never used the pills himself; he did not procure them; they were brought to the locker by the man in the next bunk who had had the medicines prescribed by an outside doctor, presumably in conformity with the prison rules; Rodriquez had simply left the medicines when he was released from custody, and while Ortiz had moved them about in the locker, it was at least open to question whether he had possession of them. Furthermore, Ortiz himself was in custody; the locker was open and subject to periodic inspections; inspections had taken place numerous times, both before and after Rodriquez had left, and the tablets and capsules were not confiscated by the sheriff's office. It is arguable that the undercover agent of the Bureau of Narcotic Enforcement put the idea in the mind of Ortiz of taking possession of them. The charge is possession and not sale, and the jury should have been permitted to determine whether or not there was, in fact, entrapment. As is said in *People* v. *Crawford*, 105 Cal.App.2d 530, 536 [234 P.2d 181] : ". . . where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of the offense charged in order to prosecute him, no conviction may be had."

In the case of *People* v. *Gallagher,* 107 Cal.App. 425, 428 [290 P. 504], a judgment of conviction of possession of narcotics was reversed because the trial court did not instruct the jury on entrapment. After stating that "... a defendant is entitled to an instruction based upon the theory of his defense, provided such instruction correctly states the law and the defense is supported by substantial evidence," the court goes on to say at page 429:

"It must be borne in mind that appellant was not charged with having sold or bargained to sell any drugs; nor was any evidence whatever introduced to show that such was his intention. The present case, therefore, is quite different from those upon which respondent seems to rely, showing that a defendant was already in the illegal possession of an article, but was entrapped into selling it. In the case at bar the theory of appellant's defense was that the possession by him of said drug was brought about solely through the instrumentalities of the state's agent and those working under him, for the very purpose of causing his arrest. As said in the case of *In re Moore,* 70 Cal.App. 483 [233 P. 805, 806], 'It may be conceded that it would be violative of sound public policy and repugnant to good morals to uphold the conviction of a person who, being entirely innocent of any intention to commit a crime, was inveigled into its commission by an officer of the law or by a private detective hired for that purpose by some self-constituted guardian of the public morals. (*People* v. *Barkdoll,* 36 Cal.App. 25 [171 P. 440].)'

"We are not to be understood as holding that appellant's version of the transaction was true; that was a question to be determined in the trial court. But as stated, if believed by the jury, it was legally sufficient to entitle him to the benefits of the doctrine of entrapment, and consequently the jury should have been instructed accordingly."

The reporter's transcript in this case shows that after the jury's verdict was returned, the following took place:

"(As the jury left the courtroom the foreman of the jury walked up to the Judge's bench and stated the following.)

"FOREMAN MORRILL: We still have a lot of questions in our mind, Judge.

"THE COURT: Well, that is fine."

We do not wonder that the jury, even after convicting the defendant under the instructions given by the court, had "a lot of questions" in their minds. We also have a lot of questions. It is a shock to the sensibilities of free Americans

to know that a man accused of acquiring possession of harmless drugs under the circumstances related in the record should be given the same punishment, qualitatively, as those guilty of murder, rape and highway robbery. We conclude that the errors referred to were prejudicial in their cumulative effect and that the conviction resulted in a miscarriage of justice.

The judgment is reversed.

Brown, J., and Stone, J., concurred.

A petition for a rehearing was denied March 14, 1962 and respondent's petition for a hearing by the Supreme Court was denied April 11, 1962.