[No. D019238. Fourth Dist., Div. One. Nov. 21, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNATON SAMPSON GEORGE, Defendant and Appellant.

## COUNSEL

Robert F. Gusky, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TODD, J.**—A jury convicted Johnaton Sampson George of one count of possession of a controlled substance in jail. (Pen. Code,[1] § 4573.6.) The trial court sentenced George to the middle term of three years in state prison, with two years stayed, to be served consecutively to an eight-year prison term

[1]All statutory references are to the Penal Code unless otherwise specified.

previously imposed in another case. On appeal, George, subsequently accused of murdering a man in a carjacking during an escape while awaiting trial, contends the trial court erred in ordering him to be shackled during this trial and exacerbated the error by calling further attention to the security measures with a jury admonishment. George also contends there was insufficient foundation to overcome a hearsay objection to an exhibit that linked him to the controlled substance found in the jail. Additionally, George contends that the prosecution failed to prove a necessary element of the charged crime, lack of authorization for possession of the controlled substance. In a related assignment of error, George raises the failure to instruct the jury in this regard.

FACTS

About 10 p.m. on February 16, 1992, a confidential informant told San Diego Sheriff's Deputy Donald Williams there were drugs inside the north side of Dormitory Ten at Los Colinas Men's Detention Facility in Santee. Williams and Deputy Kenneth Martin, the deputy in charge of Dormitory Ten, obtained approval from their sergeant to conduct a search of the dormitory. About midnight, the dormitory was cleared of inmates, including George, and the search team consisting of six deputies proceeded to look for the drugs. During the course of the search, Martin searched a locker with lock No. 536. Martin found court papers and a welfare pack inside the locker. The court papers were in George's name. Martin removed the court papers that were on top of the welfare pack. Inside the welfare pack, in plain view, was a plastic baggie containing a white powdery substance later determined to be a 10th of a gram of methamphetamine. Martin called the contact area and was informed George was assigned lock No. 536. Thereafter, George was called out to the control area where he was interviewed by Martin and Sergeant Maschka.

Martin gave George his *Miranda* rights, and George indicated he was willing to speak to the officers. George told Martin he did not know anything about any drugs in his locker and that he had found the inmate welfare pack inside the shower earlier in the evening; George said the pack must have belonged to someone else. The officers had not mentioned that drugs were found in the welfare pack during the course of the interview. Later, George said the pack was inside the locker and that the inmate before him must have left it there.

Prior to the trial on this offense, George was housed in the Metropolitan Correctional Center (MCC) in downtown San Diego. George stands accused of killing a man on October 5, 1992, in the carjacking of the man's vehicle after George escaped while being transported between court and MCC.

The prosecution made a pretrial motion advocating the use of physical restraints on George during trial. To support the motion, the prosecution presented (1) the preliminary hearing transcript from People v. George (Super. Ct. San Diego County, 1992, No. CR136564), in which George was charged with murder in the first degree with the special circumstance of murder committed in the course of an escape, among other things, stemming from the October 5, 1992, incident, as well as the ensuing information; (2) records of George's 1978 conviction for escape from the California Medical Facility as well as his 1992 conviction for escape from the South Bay Detention Facility; (3) testimony of a deputy sheriff who was involved with the apprehension of George after his two escapes from San Diego County jail facilities in 1992; and (4) testimony from a deputy marshal on courtroom security.

The preliminary hearing transcript indicated that at one point before October 5, 1992, George told Robert Hasten, a cellmate at MCC, that he was going to attempt an escape the next time he went to court in El Cajon.

According to Hasten, George discussed escaping from a sheriff's department van because the vans typically have only one driver and the vans' doors usually were not very well secured. George told Hasten he would escape by kicking open a van door and unfasten his handcuffs with a key he had obtained from a correctional officer's key chain. George also told Hasten once he was out of the van he would seize an automobile to complete the escape and "smoke" or kill anybody that got in his way.

On October 5, 1992, George was being transported from the El Cajon Superior Court to MCC in a sheriff's department van driven by Deputy Lydia Werner, the only deputy in the van. George was in a waist chain and handcuffs, but was able to remove his handcuffs and chains with a key. In the area of 4th Avenue just before Market Street, Werner heard a kicking sound coming from inside the van. By the time Werner could stop the van and run around to the exterior of the side door, George already had pushed out the door and was able to slip out the bottom; Werner saw him running up the sidewalk across Market Street toward 4th Avenue. Werner chased George and caught up with him as he was pulling a woman out of a car. Werner placed herself between the woman and George. Werner and George struggled and Werner was knocked unconscious. George grabbed Werner's .357-caliber revolver and ran down the street. When George got to 5th Avenue and Market Street, he confronted Mark McGee, a taxicab driver, and demanded that he get out of the cab. McGee refused and George pointed Werner's gun at him and repeated his demand. McGee grabbed George's wrist and stepped on the accelerator; George was dragged along with the

moving cab. McGee then stepped on the brakes and George said, "I'll kill you, bitch," before biting McGee in the eye. Eventually, McGee was able to get George off the cab by accelerating and braking the vehicle.

The next person George encountered was not as fortunate. Michael Champion was driving his Honda Civic in the area when George jumped onto the Civic and stuck his arm inside. George told Champion in a very matter of fact tone, "Give me the car, man." Champion responded, "No, get out of my car." George said, "Give me your fuckin' car." Champion responded, "No. It's my car. Get out of my fuckin' car." George repeated his demand and then pointed the gun at Champion's head. Champion said, "Wait, wait, wait." George said, "Okay," and then fired the gun at Champion's head at point-blank range. Champion died of the gunshot wound to the head.

## DISCUSSION

### I

George contends the court erred in adopting "the maximum" security measures possible, rather than considering less prejudicial alternatives;[2] he further argues the court erred by admonishing the jury[3] to disregard the security measures, arguing this admonition needlessly focused the jury's attention on the security measures. There was no error.

Section 688 reads: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

In *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], our Supreme Court "reaffirm[ed] the

---

[2]Throughout this trial, the court employed maximum security measures, including leg chains, waist chains and handcuffs attached to the waist chains. Also, as part of the security, two bailiffs were stationed inside the well and one or more other bailiffs were stationed in another area in the courtroom. At George's preliminary hearing on the escape/murder charge, he wore leg chains and waist chains, but his hands were free. The leg and waist chains were not visible except when he walked from the defense table back into the holding area.

[3]The admonishment that George complains of took place during voir dire. It was as follows: "You're going to see that in this courtroom we have perhaps some additional security. You may have seen a bailiff outside, you may see two in here. You may see during the course of the trial that Mr. George has shackles on the wrist area. Again, that's based upon the determination that this court has made[,] not based upon anything that has to do with this case but based upon the situation that Mr. George finds himself in San Diego. [¶] The fact that there is the additional security measures that are in place, again, should not be used by you in any way in deciding the case that's out here. If for any reason you feel whatever you know about this case or whatever is perceived is going to have an affect, that it's important, judge, you know, I don't think I can be fair and objective in this case. Fine, we'll go ahead and excuse you, then we'll be going on to the other members of the jury panel, no problem with that whatsoever."

rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (Fn. omitted.) " 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' " (*People* v. *Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351].) "Moreover, '[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . .' " (*Ibid.*)

The appropriate standard of review is abuse of discretion. (*People* v. *Duran, supra,* 16 Cal.3d at pp. 291, 293, fn. 12.) In *People* v. *Duran,* the Supreme Court found that the shackling of the defendant was an abuse of discretion because: "No reasons for shackling the defendant appear on the record. There is no showing that defendant threatened to escape or behaved violently before coming to court or while in court. The fact that defendant was a state prison inmate who had been convicted of robbery and was charged with a violent crime did not, without more, justify the use of physical restraints. As our discussion heretofore indicates, the trial judge must make the decision to use physical restraints on a case-by-case basis. The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses unless there is a showing of necessity on the record. The court's summary denial of the motion to release defendant from his shackles was not based upon such a showing of record and implies a general policy of shackling all inmate defendants accused of violent crimes. We therefore conclude that it was an abuse of discretion to shackle defendant." (*Id.* at p. 293, fn. omitted.)

 Here, the requisite manifest need is unmistakably present in the record before us. George has a history of escapes, and in the most recent one, there was evidence he had beaten a sheriff's deputy to unconsciousness and killed an innocent motorist to perfect the escape. The trial court reviewed documentary evidence of these various escapes as well as the pending violent charges in connection with the latest escape; the court also heard testimony from law enforcement officials detailing the capture of George and opining that security had to be utmost while George was in the courtroom.

At the conclusion of the hearing, the trial court made the following ruling:

"The Court: On proper showing the court has discretion to order physical restraints most suitable to a particular defendant in view of the individual's background. In looking at the testimony that's been given to me today as

well as the documentation that's been submitted, I'll make the following findings:

"One, I'll make a finding Mr. George is by all appearances a very strong looking individual. He's very muscular. Based upon what Deputy Truitt said, it took approximately ten people to take him down, to effect an arrest after one escape. I can understand why that may be, especially if the adrenaline is pumping.

"I further take into consideration the fact that there was an escape where there's an allegation of harm, that being the death of a individual as well as injury to a female sheriff's deputy during the time of the alleged escape.

"From the standpoint of the other escapes there's no indication in '78 of any type of physical contact that may have been involved, however, in the—apparently '92 when they attempted to apprehend him after his escape from the South Bay facility, at that particular time, according to Deputy Truitt, he apparently, even after seeing a weapon, ran after waving to Deputy Truitt and giving him a greeting. He was actually observed pulling an individual out of the truck through the window, and taking off in that particular truck. So it does have a bearing upon what type of restraints should be placed upon Mr. George to see that he has used violence during the course of escapes in the past.

"Also the court is mindful of the fact that Mr. George right now is facing the maximum that a defendant can face, that is the possibility of a death penalty. And, partially agreeing with what Mr. Sweeney had to say, if a person who is looking at the possibility of 30 years in federal custody saw fit to escape, and used the means that were used, or alleged to have been used in that escape, that it goes without saying now looking at the death penalty that Mr. George could very well use the same types of physical means to attempt to get away from the predicament that he is now in. [¶] So it does appear to me that he is an extreme risk.

"From the standpoint of what type of restraints—let me further make the record as far as what Deputy Truitt stated. At one point in time the defendant [is] alleged to have said 'shoot me,' and then even after saying that ran out of the shop. At that time he was restrained by a number of men who had gone after him.

"But, the type of restraints I think is a key factor here. It boils down to, I guess, do we try and keep something from a jury that I think most, if not all jurors, might already have some understanding of Mr. George, and try and

do it with a minimum, or does the court make a determination that based upon my findings that he is an extreme flight risk with violence prevalent in his nature[?] Do I go ahead and just say let's make sure that nothing happens where either the deputy marshals or members of the audience or members of the jury have an opportunity of being hurt?

"I'm going to take the posture that I'm going to go with the maximum as opposed to the minimum. The maximum, as far as I'm concerned, would be the leg chains that are now in place as well as the waist and handcuffs that are attached to the waist.

"From the standpoint of the additional bailiffs, I will abide by Sergeant Madruga's determination that there should be more than just one bailiff during the presence of the course of these proceedings. From the standpoint of the number, I would agree that two inside the well, at or about Mr. George, with one or other bailiffs in an area in the courtroom but not taking an active part as far as the escorting of Mr. George, unless it's outside the presence of the jury.

"From the standpoint of informing the jury itself, I think that it's important that the court instruct the jury in such a way and to voir dire the jury in such of a way to attempt to alleviate any problems that the restraints may have upon the jury.

"I do voir dire, which I think is a pretty good voir dire from the standpoint of right up front talking to the jury, I'm not trying to hide things from the jury, and finding out what they are thinking. And we're going to find out tomorrow, how many people may have some knowledge of Mr. George, from the standpoint of what they've read.

"I'm not saying they have knowledge of him as a human being or the true facts. Do they have some knowledge where they formed certain opinions[?] And, I'm going to have to have a lot of questions asked of the jurors to make sure we end up getting 12 that, notwithstanding whatever Mr. George may be facing in some other case, that the jury understands that this case should be decided in and of itself not based upon any past history and any particular thing that he may be facing at this point in time. And, based upon the fact, that fact that they can expect Mr. George being in some type of restraints and not let that interfere.

"If I have problems in obtaining such a jury, then I may reconsider what has been presented to me at this point in time. But, I feel comfortable that it may take a while but that we're going to find 12 people that are going to be

able to satisfy the court and the attorneys to the effect that they're going to be able to listen to this possession, alleged possession of meth at the jail facility and base their decision only on those facts and the law and not base it upon anything else that may be out there. [¶] So, I will [accept] the restraints that I've just indicated during the course of proceedings."

The trial court thoughtfully considered the evidence before it and concluded that maximum security measures were required. There is an abundance of factual reasons to support this conclusion. The record reflects George had shown a remarkable propensity for violence as well as a determination not to remain in custody, no matter what. The record more than amply demonstrates a manifest need for maximum security measures in a public trial. As our Supreme Court noted in *People* v. *Duran, supra,* 16 Cal.3d at page 291, footnote 9: "We recognize that shackles or manacles are not easily hidden from the jury's view and do not wish to imply that they should not be used simply because they are obtrusive. We simply note that less drastic and less visible restraints should be employed when, in the exercise of his discretion, the judge concludes it is safe to do so." We cannot say on this record that the trial court abused its discretion.

George complains the trial court did not consider less drastic security measures. Our reading of the record does not bear this out. George's argument that lesser security measures were employed at the preliminary hearing in People v. George, *supra,* No. CR136564 (see fn. 2, *ante*) without untoward results is unpersuasive. The preliminary hearing, of course, did not involve a jury. The trial court was well aware of this distinction. There was no abuse of discretion in concluding the presence of jurors required different and more extreme security measures.

Equally unavailing is George's reliance on the comments of a venireperson who indicated the fact George was handcuffed would lead him to render a guilty verdict. These comments were made out of the presence of other members of the jury panel. Furthermore, this venireperson was excused. Therefore, his comments are irrelevant.

George's argument that the trial court erred by calling the jury's attention to the security measures (see fn. 3, *ante*) borders on being disingenuous. If visible restraints are used, the court has a sua sponte duty to instruct the jury

that such restraints should have no bearing on the determination of the defendant's guilt. (*People* v. *Duran, supra,* 16 Cal.3d 282, 291-292.)[4]

## II

 George contends the trial court erred in admitting exhibit 4, a card used by Los Colinas Men's Detention Facility to identify lock assignments for inmates, pursuant to Evidence Code section 1280. He argues there was insufficient foundation to overcome his hearsay exception. The contention is without merit.

Exhibit 4 showed lock No. 536 was assigned to George. Lock No. 536 was used to secure the locker in which the methamphetamine was found along with George's court papers. According to Deputy Martin, the card is routinely prepared by an employee of the sheriff's department, either an information clerk or deputy, who has reviewed a list of incoming inmates who have been transferred from other correctional facilities in the county to Los Colinas. That list is sent to Los Colinas about two hours before the inmates are transferred to Los Colinas. The information clerk or deputy reviews the names on the list and assigns each incoming inmate a bunk and a lock.

Evidence Code section 1280 provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made by and within the scope of duty of a public employee;

"(b) The writing was made at or near the time of the act, condition, or event; and

"(c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

 " 'The trustworthiness requirement for this exception to the hearsay rule is established by a showing that the written report is based upon the observations of public employees who have a *duty* to observe the facts and

---

[4]A form of the required sua sponte instruction is now stated in CALJIC No. 1.04 (1992 new). The Use Note states that the instruction should be given whenever the restraints are in the view of the jury.

report and record them correctly.' [Citation.] Whether the trustworthiness requirement has been met is a matter within the trial court's discretion." (*People* v. *Parker* (1992) 8 Cal.App.4th 110, 116 [10 Cal.Rptr.2d 38].)

In contrast to the business records exception (Evid. Code, § 1271), Evidence Code section 1280, also known as the official records exception, "permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1280, p. 316.) "In addition to taking judicial notice, a court may rely on the rebuttable presumption that official duty has been regularly performed (Evid. Code, § 664) as a basis for finding that the foundational requirements of Evidence Code section 1280 are met." (*People* v. *Dunlap* (1993) 18 Cal.App.4th 1468, 1477 [23 Cal.Rptr.2d 204].)

 Here, Martin's testimony established exhibit 4 was filled out as a routine procedure by jail personnel immediately after lock No. 536 was assigned to the incoming inmate. This testimony satisfied the requirements of Evidence Code section 1280, namely that exhibit 4 was prepared by a public employee acting within the scope of his or her duty, at or near the time of the event recorded, and the sources of information and method and time of preparation were such as to indicate its trustworthiness. There was no abuse of discretion in admitting exhibit 4.

## III

 George contends the prosecution failed to prove the lack of authorization required for violation of section 4573.6; he further contends the trial court erred by failing to instruct the prosecution had the burden to prove lack of authorization. These related contentions lack merit.

Section 4573.6 provides in pertinent part: "Any person who knowingly has in his or her possession . . . in any county, city and county, or city jail, road camp, farm, or any place or institution, where prisoners or inmates are being held under the custody of any sheriff . . . any controlled substances, the possession of which is prohibited by Division 10 (commencing with Section 11000) of the Health and Safety Code . . . , without being authorized to so possess the same by the rules of the Department of Corrections, rules of the . . . jail . . . or by the specific authorization of the warden, superintendent, jailer or other person in charge of the . . . jail . . . , is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years."

George erroneously assumes that lack of authorization is an element of section 4573.6 that must be proved by the prosecution. Rather, authorization is a defense to the offense; the burden is on the defendant, not the prosecution.

■ "It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant. [Citations.]

"It was stated in *Ex parte Hornef* [(1908)] 154 Cal. 355 [97 P. 891], that ' "[t]he question is whether the exception is so incorporated with, and becomes a part of the enactment, as to constitute a part of the definition, or description of the offense; for it is immaterial whether the exception or proviso be contained in the enacting clause or section, or be introduced in a different manner. It is the nature of the exception and not its location which determines the question. Neither does the question depend upon any distinction between the words 'provided' or 'except' as they may be used in the statute. In either case, the only inquiry arises, whether the matter excepted, or that which is contained in the proviso, is so incorporated with, as to become, in the manner above stated, a part of the enacting clause. If it is so incorporated, it shall be negatived, otherwise it is a matter of defense." ' Thus, where exceptions or provisos are not descriptive of the offense, or define it, but rather afford a matter of excuse, 'they are to be relied on in [the] defense.' (*Id.*, at p. 360; other citations omitted.)" (*In re Andre R.* (1984) 158 Cal.App.3d 336, 341-342 [204 Cal.Rptr. 723]; see also 4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Proceedings Before Trial, § 2082, p. 2451.)

In *In re Andre R., supra,* 158 Cal.App.3d 336, the Court of Appeal interpreted section 12021.5, which provides in pertinent part that "a minor may not possess a concealable firearm unless he or she has the written permission of his or her parent or guardian to have such firearm . . . ." The Court of Appeal concluded the prosecution was not required to prove the lack of a parent's written permission to carry a concealable firearm as an element of the crime under section 12021.5. (*Andre R., supra,* at p. 341.) "Here, the existence of written parental permission does not define or describe the offense. The offense is the possession of a concealable firearm by a minor. Hence, written parental permission 'excuses' a minor from the sanctions imposed by section 12021.5 and must be raised as a defense by the accused." (*Id.* at p. 342.)

■ Similarly here the existence of a jail rule authorizing possession of a controlled substance or of specific authorization by the warden does not

define or describe the offense at issue here. The offense is possession of a controlled substance in a jail facility by an inmate or visitor. Accordingly, a jail rule or specific authorization from a warden would excuse a defendant from the sanctions imposed by section 4573.6, but it must be raised as a defense by the accused. (Cf. *People* v. *Zepeda* (1964) 231 Cal.App.2d 18, 20-22 [41 Cal.Rptr. 571]; *People* v. *Ortiz* (1962) 200 Cal.App.2d 250, 257-258 [19 Cal.Rptr. 211].)[5]

We find our interpretation analogous to that afforded to Health and Safety Code section 11350, which criminalizes possession of "any controlled substance classified in Schedule III, IV, or V which is a narcotic drug, unless upon the written prescription of a physician . . . licensed to practice in this state." In a prosecution under Health and Safety Code section 11350, it is up to the defendant to prove the existence of a prescription; the prosecution need not prove the nonexistence of a prescription. (*People* v. *Martinez* (1953) 117 Cal.App.2d 701, 708 [256 P.2d 1028].)

Moreover, in this case we are dealing with methamphetamine, which is contraband that is illegal to possess.[6] Any jail rule or specific authorization by a warden to possess methamphetamine in a jail facility would be authorizing a criminal act within the jail; such authorization would be facially invalid. In other words, "there can never be an 'authorized' possession." (See *People* v. *Wilson* (1978) 83 Cal.App.3d 982, 991 [148 Cal.Rptr. 47].)

The trial court instructed the jury with a modified version of CALJIC No. 12.00 as follows:

"POSSESSION OF A CONTROLLED SUBSTANCE IN JAIL (Penal Code Section 4573.6)

"Defendant is accused in Count One of the information of having committed the crime of illegal possession of a controlled substance in jail, a violation of Section 4573.6 of the Penal Code.

"Every person who knowingly has in his possession a controlled substance, namely, methamphetamine, in any county jail or any place where

[5]George relies on *People* v. *Zepeda, supra,* 231 Cal.App.2d 18, and *People* v. *Ortiz, supra,* 200 Cal.App.2d 250 for the proposition that lack of authorization is an element of section 4573.6. We note that the Court of Appeal in *Ortiz* assumed this proposition without authority or analysis and apparently for the first time. (200 Cal.App.2d at p. 257.) The only subsequent case citing *Ortiz* for this proposition is *Zepeda,* which has not been cited as authority in any published case. To the extent *Ortiz* and *Zepeda* are contrary to our conclusion, we disagree with those cases.

[6]Methamphetamine is a schedule II drug (Health & Saf. Code, § 11055, subd. (d)(2) that is illegal to possess "unless upon the prescription of a physician . . . licensed to practice in this state . . . ." (Health & Saf. Code, § 11377.)

prisoners or inmates are being held under the custody of the Sheriff, is guilty of the crime of illegal possession of a controlled substance in jail, in violation of Penal Code, Section 4573.6.

"In order to prove such crime, each of the following elements must be proved:

"1. A person exercised control or the right to control a certain controlled substance,

"2. Such person had knowledge of its presence,

"3. Such person had knowledge of its nature as a controlled substance,

"4. The substance was in an amount sufficient to be used as a controlled substance; and,

"5. The person was in jail or being held under the custody of the Sheriff.

"There are two kinds of possession: actual possession and constructive possession.

"Actual possession requires that a person knowingly exercise direct physical control over a thing.

"Constructive possession does not require actual possession but does require that a person knowingly exercise control or the right to control a thing, either directly or through another person or persons." This instruction is appropriate in prosecutions under section 4573.6. (See Use Note for CALJIC No. 12.00, citing *People* v. *Carrasco* (1981) 118 Cal.App.3d 936, 948-949 [173 Cal.Rptr. 688].) There was no instructional error here.

DISPOSITION

Affirmed.

Kremer, P. J., and Benke, J., concurred.