[No. F024542. Fifth Dist. Nov. 4, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTHEW VINCENT SPRY, Defendant and Appellant.

[No. F027268. Fifth Dist. Nov. 4, 1997.]

In re MATTHEW VINCENT SPRY on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., III., and IV. of the Discussion.

## COUNSEL

K. Douglas Cummings, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### HARRIS, J.—

#### INTRODUCTION

Appellant was charged and convicted of possession of heroin. He relied on the defense that he lawfully possessed the heroin for the limited purpose of disposal, and the jury was instructed pursuant to CALJIC No. 12.06 concerning the elements of this defense. On appeal, he asserts the instruction failed to define the allocation and magnitude of the burden of proving this defense. Appellant also raises additional challenges to his conviction on appeal and through a petition for writ of habeas corpus.

In the published portion of this opinion, we will review CALJIC No. 12.06 and conclude the jury was not correctly instructed as to the magnitude of appellant's burden of proving his affirmative defense, and reverse his conviction. In the nonpublished portion of this opinion, we will address appellant's remaining issues for the guidance of the trial court on remand.

#### STATEMENT OF THE CASE

On September 28, 1994, an information was filed in Fresno County Superior Court charging appellant Matthew Vincent Spry with count I,

possession of heroin, a felony (Health & Saf. Code, § 11350), and count II, being under the influence of a controlled substance, a misdemeanor (Health & Saf. Code, § 11550, subd. (a)). It was also alleged that appellant suffered three prior serious and/or violent felony convictions within the meaning of the three strikes law, and served two prior prison terms pursuant to Penal Code section 667.5, subdivision (b). Appellant pleaded not guilty and denied the special allegations.

On March 15, 1995, appellant's jury trial began. The court granted the prosecution's motion to file a first amended information, which repeated the original charges and corrected the dates of the prior conviction allegations. Appellant again pleaded not guilty and denied the special allegations. The court granted appellant's motion to bifurcate the matter of the prior convictions. On May 22, 1995, the jury found appellant guilty of count II, being under the influence of a controlled substance, a misdemeanor. The jury was deadlocked and unable to reach a verdict as to count I, felony possession of heroin. The court declared a mistrial as to count I, and selected another trial date. The court deferred the matter of the bifurcated hearing on the prior convictions for the second trial.

On June 27, 1995, appellant's second trial was scheduled to begin. Appellant moved for diversion pursuant to Penal Code section 1000. The motion was denied, and the matter reassigned for trial.

On July 5, 1995, appellant's second jury trial began as to count I, felony possession of heroin. The court granted appellant's motion to bifurcate the matter of the prior convictions. Appellant waived his right to a jury trial on the prior convictions. On July 12, 1995, the jury found appellant guilty of count I, felony possession of heroin.

On July 13, 1995, the court conducted the bifurcated hearing on the prior convictions. The court granted the prosecution's motion to amend the information and correct the allegations pertaining to the alleged second prior conviction. The court ordered the prosecution to file a second amended information reflecting the correction. The court found that appellant had suffered three prior serious and/or violent felony convictions within the meaning of the three strikes law, and had served two prior prison terms pursuant to Penal Code section 667.5, subdivision (b).

On July 25, 1995, the court granted appellant's motion to release the names and addresses of the jurors.

On August 23, 1995, appellant filed a motion to strike one of the prior convictions, alleging that it had been found unconstitutional in an earlier

proceeding. On August 29, 1995, appellant filed a motion for new trial, alleging the jurors were not correctly instructed concerning his trial defense. The prosecution filed opposition to appellant's motions to strike and for new trial.

On September 8, 1995, a hearing was held on appellant's motions to strike and for new trial. The motions were denied. The court sentenced appellant to the third strike term of 25 years to life as to count I, with a consecutive term of 90 days for count II. The court also imposed a consecutive term of two years for the two prior prison term enhancements.

On September 12, 1995, the prosecution filed the second amended information with the corrected date and offense for the alleged second prior conviction allegations.

On September 12, 1995, appellant filed a timely notice of appeal.

On December 4, 1996, appellant filed a petition for writ of habeas corpus, and requested consolidation of the writ and appeal.

On December 9, 1996, this court granted appellant's motion and consolidated the writ petition and the pending appeal. On January 10, 1997, respondent filed an informal response. On January 21, 1997, appellant filed a reply to respondent's informal response.

FACTS

On June 26, 1994, at approximately 4 p.m., the Fresno Fire Department paramedics responded to a dispatch of a narcotics overdose at a residence in Fresno. Captain Harold Nilsen and the paramedic team entered the residence and encountered appellant Matthew Spry. Appellant directed Captain Nilsen to the hallway where he discovered an individual, later identified as John Allen, unconscious on the bedroom floor. Captain Nilsen determined Allen had a pulse and heartbeat, he was not breathing, and his symptoms were consistent with an overdose of heroin. The paramedics administered an intravenous medication to counteract the depressant effect of heroin on Allen's respiratory system, and Allen regained consciousness. Allen became very agitated and tried to remove the intravenous line from his arm. Captain Nilsen explained to Allen that he needed further treatment at the hospital, but Allen refused to cooperate and resisted the paramedics as they placed him on the ambulance gurney. Captain Nilsen testified appellant interceded, asked them to leave Allen alone, and said Allen would be okay. Captain Nilsen advised appellant to remain cool and they would care for Allen.

Captain Nilsen could not recall whether appellant said anything about the type of narcotics used by Allen or the circumstances surrounding the overdose.

Fresno Police Department Officer John McCrery also responded to the dispatch, and arrived at the residence after the paramedic unit. Officer McCrery observed the paramedics working on Mr. Allen in the bedroom while appellant watched. The paramedics told McCrery that Allen had overdosed on narcotics. Officer McCrery spoke with appellant in the living room, asked about the circumstances of Allen's overdose, and whether Allen used drugs. Appellant stated he had been drinking beer with Mr. Allen approximately 30 minutes before the incident. Mr. Allen went into the bathroom, closed the door, and stayed inside for five to ten minutes. Mr. Allen walked out of the bathroom, went into the bedroom and collapsed. Appellant stated he called 911 and administered CPR while he waited for the paramedics. Appellant stated he did not know what Allen used because the bathroom door remained closed the entire time he was inside.

Officer McCrery testified he did not detect the odor of alcohol from appellant while they spoke. Officer McCrery testified appellant was functioning fairly well, but his pupils were constricted, consistent with the use of an opiate. Officer McCrery decided to fully evaluate appellant to determine if he was under the influence of narcotics.

Officer McCrery never had an opportunity to evaluate appellant because the paramedics needed his assistance to restrain Mr. Allen as he continued to resist their efforts to take him to the hospital. Officer McCrery's partner remained with appellant while McCrery called for a backup unit. As McCrery assisted the paramedics, he noticed Mr. Allen had a new injection site on his arm, which was still open and surrounded by "[f]resh blood that was not real dried up."

Officer Joseph Gomez responded to the backup call and spoke with appellant in the living room. Appellant stated that the residence was his house, and his friend overdosed on heroin in the bathroom. Appellant also stated he called 911 after his friend collapsed. Officer Gomez asked appellant if he used drugs. Appellant replied that he did not. Officer Gomez asked appellant if he used heroin. Appellant replied no. Officer Gomez did not detect the odor of alcohol from appellant. Officer Gomez testified appellant's pupils were extremely small, he spoke in a slow manner, he seemed very relaxed, and his condition was consistent with being under the influence of opiates or heroin.

Officer Gomez placed appellant under arrest for being under the influence of narcotics, searched him and discovered a child's small toy balloon in

appellant's right front pants pocket. As Gomez examined the balloon, appellant stated, "It's black tar," and it was the "same stuff" Allen overdosed on. Gomez opened the balloon and removed a small piece of black tar heroin. Gomez examined appellant's body for recent injection sites, and appellant stated, "you're not going to find anything because I ate it," referring to the heroin. Gomez did not find any injection sites on appellant's body.

Officer Gomez testified appellant never said he took the heroin from Mr. Allen in order to throw it away.

Officers McCrery and Gomez conducted a quick search of the residence, but they did not discover any narcotics or paraphernalia in the house. The house was furnished and there were children's toys inside, but no one else was home during the incident.

Appellant's blood test revealed he was under the influence of heroin and phencyclidine (PCP). The substance in the balloon consisted of .07 grams of heroin, an amount suitable for personal use.

Appellant was charged with felony possession of heroin and misdemeanor being under the influence of narcotics. At his first trial, he was convicted of being under the influence, but the jury deadlocked on the possession charge. At his second trial for the possession charge, Officer McCrery testified concerning the common methods to use heroin. The heroin rapidly enters the system when injected with a needle and immediately produces a euphoric feeling. A person may also swallow heroin, but it takes longer to enter the system as compared with an injection. Officer Gomez testified that someone who swallows heroin avoids the accumulation of injection sites, and that it takes 20 to 30 minutes to enter the system as compared to 1 to 3 minutes if injected.

Appellant testified at trial concerning his version of the events. Appellant admitted he had been a heroin addict "off and on" for eight years. His normal use consisted of $20 to $30 of heroin per day. He had two prior convictions for robbery, and he was released from prison in 1991. Appellant admitted he committed the prior robberies to support his heroin addiction at the time.

Appellant testified he lived at the residence with his then girlfriend (now his wife) and their children. He was regularly employed as a tile setter. At the time of the incident, appellant was enrolled in a 21-day methadone detoxification program in an attempt to get off heroin. As of June 26, 1994, appellant had been in the current program for one week. Appellant needed to

obtain a daily dose of methadone in order to defeat the severe physical withdrawal symptoms of heroin.

Appellant testified that on the morning of June 26, 1994, he was planning to take his family to the lake. He left his residence and headed for the methadone clinic, but it was already closed for the day. Appellant realized he would be unable to obtain the methadone dose and would probably suffer from the heroin withdrawal symptoms. Appellant decided to contact an associate near the methadone clinic to purchase some heroin to get him through the day. Appellant purchased a "dime bag" of heroin for $10, which consisted of a small piece of tar heroin contained in a child's balloon. Appellant immediately ingested the heroin by swallowing it. Appellant realized that it took longer to feel the effect of the heroin because he swallowed it. Appellant swallowed the heroin because he had been trying to avoid the use of needles. Appellant insisted he did not ingest the heroin to get "high" but to simply control his withdrawal symptoms. Appellant intended to return to the methadone clinic the next day for his regular dose.

Appellant returned to his residence after swallowing the heroin. His girlfriend and the children were home, and appellant went into the backyard to prepare for their trip. Appellant testified that John Allen arrived at the residence at approximately 1:30 p.m. Appellant greeted Allen, and Allen immediately went into the bathroom. Appellant's girlfriend and Allen soon began to argue, and his girlfriend told Allen not to bring "that crap over here." Appellant knew that she referred to drugs. Appellant went into the house, and found Allen in the bathroom and appellant's girlfriend in the hallway. Appellant testified there was a small balloon of heroin on the bathroom counter, next to a spoon and a syringe. Appellant believed Allen was about to inject the heroin. Appellant told his girlfriend to stop arguing and go outside, and he would handle it. Appellant turned to Allen and told him not to bring that stuff to his house because he was trying to get off it, and it was dangerous to have around the children.

Appellant described Allen as intoxicated, very belligerent and acting "like a jerk." Appellant grabbed the heroin balloon from the bathroom counter and put it in his pocket. Appellant testified he intended to get rid of it and flush it down the toilet, but Allen remained in the bathroom and barred the way. Appellant decided to dispose of the heroin after Allen left the bathroom. Appellant returned to the backyard and left Allen in the bathroom. Appellant's girlfriend was very angry, and she left with the children.

Appellant testified that he returned to the house about 10 minutes later and found Allen unconscious on the hallway floor. Allen's eyes were rolled back

and he was not breathing. Appellant dragged Allen into the bedroom to use the phone. Appellant started CPR and called 911. Appellant placed the phone on his shoulder so he could work on appellant as he spoke to the operator.

The tape recording of appellant's 911 phone call was played to the jury, and the transcript introduced into evidence. Appellant reported an overdose and said the person was "blue" and not breathing. Appellant said he was starting mouth-to-mouth, and that the person "won't come out. He's blue, he's dead. I've been . . . trying to give him mouth-to-mouth right now with no one here." As the operator requested more information, appellant stated "this has happened to me twice." Appellant repeatedly stated the person was "blue" and not breathing, and did not have a heartbeat. The operator gave instructions on mouth-to-mouth resuscitation, and appellant replied, "I've done it before, I've brought him back twice." The operator led appellant through the emergency procedure, and asked what the person overdosed on. Appellant replied it was heroin. As appellant followed the operator's instructions, he suddenly said "Can you hear that? John, right, John, he's blowin' it back out? . . . He's like he's snorin' or blowin' it back out or something." Appellant said that "air's gettin' in him, I can tell that." The operator instructed appellant to continue until the paramedics arrived. Appellant remained on the phone until the paramedics arrived and stated, apparently to the paramedics, "I go . . . what happened . . . he come over there, came out of the bathroom and fell down."

Appellant's trial testimony continued after the recording of the 911 tape was played to the jury. Appellant admitted Officer Gomez recovered the heroin balloon from his pocket. Appellant testified he told Officer Gomez the heroin was "the same stuff he's dying on," referring to Allen.

On cross-examination, appellant admitted he purchased and used PCP one or two days before this incident. Appellant purchased the PCP from a different dealer, and contacted the dealer with a pager number. Appellant did not feel the effects of the PCP on the day of the incident. Appellant insisted he purchased the heroin just to "get me through another day, so I wasn't really loaded." Appellant explained that when he regularly used heroin, he needed two or three "dime bags" per day. He had been on the methadone program long enough to have "tapered some," and a dime bag was enough to get him through the day.

The prosecutor asked appellant about the circumstances of taking the heroin balloon from Allen. Appellant testified that Allen was drunk and obnoxious, and appellant took the balloon off the counter. Appellant was

asked about his failure to immediately flush the heroin balloon down the toilet. Appellant explained that Allen was standing in the back of the bathroom next to the toilet. "If I would have grabbed it and threw it in the toilet, he could have reached down and grabbed it before I even had a chance to flush it." Appellant wanted to avoid a physical fight with Allen because Allen was drunk. Appellant testified he went into the backyard and left Allen in the bathroom. Appellant returned inside about five to ten minutes later and found Allen unconscious on the floor.

Appellant did not remember speaking with Officer McCrery about the circumstances of Allen's condition or saying they were drinking beer. Appellant recalled that Officer Gomez removed the heroin balloon from appellant's pocket. Appellant testified he told Officer Gomez "that's the same stuff he's dying on in there." Appellant admitted he did not tell Officer Gomez he took the heroin balloon from Allen to prevent him from using drugs in his house.

Appellant's then girlfriend and current wife also testified concerning John Allen's conduct at their house. She was angry when Allen arrived because Allen was drunk. Allen went into the bathroom and produced a small balloon from his pocket. She realized it contained heroin, and "blew up" and told Allen to leave. "We didn't want it around. It wasn't part of, you know, our life anymore." Appellant told her to leave and he would take care of it. When she left the bathroom, the balloon was on the bathroom counter and Allen was standing next to it. She described Allen as angry. She walked down the hallway but watched as appellant took the balloon off the bathroom counter and placed it in his pocket. As appellant left the bathroom, she went outside and left with the children. Later that evening, she was contacted by Officer Gomez and informed that appellant was arrested for possession of heroin. She admitted she did not tell Officer Gomez that appellant took the heroin balloon from Allen. She explained that the subject did not come up.

John Allen, the overdose victim, testified on appellant's behalf. Allen explained that he was very drunk when he arrived at appellant's house. Allen spent the previous day and night drinking beer and Long Island Iced Tea. Allen purchased two dime balloons of heroin and continued to drink beer as he headed to appellant's house. Upon arrival, Allen went into the bathroom. Appellant's girlfriend became angry and told him to leave. Appellant told his girlfriend to leave, he would handle it. Allen produced one heroin balloon and his syringe, placed the heroin balloon on the bathroom counter and prepared to inject the drugs. Appellant became angry and told Allen not to use heroin because Allen had overdosed on two previous occasions at appellant's house. Allen testified appellant took the heroin balloon off the

counter and walked out of the bathroom. Allen testified he allowed appellant to take the heroin balloon because he still had the second heroin balloon, and remained in the bathroom to inject it after appellant left. Allen's overdose was based on his use of the second heroin balloon. Allen testified this incident marked the third time that appellant used CPR to revive Allen after an overdose. Allen admitted he had prior convictions for being under the influence of narcotics.

A counselor at the methadone clinic testified appellant attended the program through June 25, 1994, but he did not appear on June 26. The clinic closes at 11:30 a.m. every day. The counselor also explained that a heroin addict suffers withdrawal symptoms if he misses the methadone dose for just one day. The counselor confirmed that heroin is ingested into the system at a slower rate when swallowed than when injected.

In rebuttal, Officer McCrery testified he spoke with John Allen at the hospital later in the evening, and Allen denied that he used heroin. Allen stated he had been "partying" with friends for three days prior to the incident. He took some pills to calm down and sleep, but he mixed the pills with alcohol and it caused the overdose. Officer McCrery testified that Allen never stated the heroin balloon found on appellant belonged to him. However, McCrery conceded he never asked Allen about the heroin balloon.

Officer Gomez returned to appellant's residence after his arrest, and returned his personal possessions to appellant's girlfriend. She did not say anything about appellant's conflict with Allen, or that appellant took the heroin balloon from Allen.

*Instructions and closing arguments*

Appellant was charged with felony possession of heroin and misdemeanor being under the influence of narcotics. At his first trial, he was convicted of being under the influence; the jury was unable to reach a verdict as to the felony possession charge. At his trial on the felony possession charge, appellant relied on the defense theory that he took the heroin balloon from Allen simply to dispose of it, and such temporary possession was not unlawful, and requested CALJIC No. 12.06. At the instructional conference, the trial court noted a split in the decisions concerning the length of time someone may lawfully possess narcotics to dispose of it. The prosecution argued that such possession may be only for a limited time, and requested a different version of CALJIC No. 12.06. The court rejected the prosecution's argument, and decided to give the version of CALJIC No. 12.06 requested by appellant.

The jury was instructed pursuant to the following version of CALJIC No. 12.06:

"The possession of a controlled substance is not unlawful where all of the following conditions are met:

"1. The possession is based on neither ownership nor the right to exercise control over the heroin,

"2. The heroin is possessed solely for the purpose of abandonment, disposal, or destruction,

"3. The heroin is possessed for the purpose of terminating the unlawful possession of it by another person or preventing another person from acquiring possession of it, and

"4. Control is not exercised over the heroin for the purpose of preventing its imminent seizure by law enforcement.

"Length of time of possession is one of the factors that may be considered in deciding whether the defendant physically handled the substance solely for abandonment, disposal, or destruction."

In closing argument, the prosecution reminded the jury that appellant gave one version of the events at the time of the incident, and gave another version in his trial testimony. The prosecutor outlined the elements of possession of narcotics and stated it was his burden to prove the elements "beyond a reasonable doubt. But there will be no mistake about this. If I have failed in any of those four elements, you must vote not guilty. Because each of the four elements have to be proven beyond a reasonable doubt." The prosecutor reviewed the evidence and asserted the elements of the offense of possession of heroin were established beyond a reasonable doubt. "But as you probably know at this point that is not the end of your job. Because there is one additional question . . . . The question of whether or not this was, in fact, unlawful possession." The prosecutor stated that this question should take up the majority of their discussions and required resolution of the conflicting evidence.

Appellant's defense counsel reviewed the prosecution's evidence and conceded the disputed issue was whether appellant's possession was lawful or unlawful. Appellant asserted the prosecution's evidence did not establish the reason for his conduct and possession of heroin. Appellant argued that a person may lawfully possess narcotics in order to take it away from someone

and destroy it. Appellant asked the jury to review CALJIC No. 12.06, and stated that possession was not unlawful where "all of the following conditions are met." Appellant's counsel continued:

"The Defense put on evidence, we don't have to put on evidence. I think you all know the Defense does not have to put on a shred of evidence. The Prosecution has the total burden here of proving beyond a reasonable doubt all the elements of the offense. We chose to put on evidence. And we chose to put on that evidence to show that there is another alternative answer here.

"There is lawful possession. Now that evidence came in the form of John Allen's testimony. Matt's testimony. Vicki Spry's testimony.

"Here is the impact. And we've talked about reasonable doubt. You've heard probably for years what is reasonable doubt?

"Well, we know that Mr. Gunderson has to prove his case beyond whatever that reasonable doubt is. So he's got to go beyond that.

"Our evidence from it creates a reasonable doubt in your mind is sufficient. In other words, if after having heard the testimony of all the witnesses you now have a reasonable doubt as to whether Matt Spry possessed that lawfully or unlawfully, you have to find him not guilty. And it doesn't matter whether you say to yourself as you deliberate or in your heart of hearts: You know, I've heard all the evidence, all the testimony, and it—you know, it's reasonable that Matt had that heroin and he was going to keep it. That's reasonable.

"But, you know, it's also reasonable having heard that to reasonable point of view, it is a reasonable thing to believe that he had it momentarily or for that five or 10 minutes and that he really was going to dispose of it.

"If you believe that, even if there are two reasonable positions you can take, you have to give him the benefit of the doubt. And that's where that phrase comes from. It comes from the law. The benefit of the doubt. The Defendant gets the benefit of the doubt. If we've raised a reasonable doubt of the evidence, you have to find him not guilty. Even though you think it's possible that the other side is just as reasonable." Appellant's counsel asserted appellant's story was credible based on his attempts to break out of his heroin addiction and his participation in the methadone program. He reviewed the testimony of John Allen and appellant's girlfriend, which corroborated appellant's story. Appellant admitted he needed heroin that day because he missed his methadone dose, but counsel argued that appellant did

not need to ingest any more heroin, and the balloon in his pocket belonged to Allen. Appellant was unable to immediately destroy it because Allen was drunk and belligerent, and appellant needed to wait until Allen left the house. Counsel asserted that appellant attempted to inform the officers about the incident, based on appellant's statement that the heroin balloon was the "same stuff" that Allen overdosed on. Counsel asserted that neither appellant's girlfriend nor Allen would have known that such possession was lawful, and there was no reason for them to further discuss the matter with the police. Counsel reminded the jury that appellant called 911 and saved Allen's life, even though he could have just left Allen or dragged him out into the yard "and be done with it."

In rebuttal, the prosecutor argued that the conflict in the case involved the alleged lawfulness of appellant's possession. He asserted that the testimony of the defense witnesses should be rejected because of their bias and the inconsistencies in their stories. The prosecutor reminded the jury to "[r]emember [that control is not exercised to prevent imminent seizure by law enforcement is] one of the four elements, the four conditions that have to be met that you have to find *in order to make this a lawful possession. . . .*" (Italics added.) He argued that appellant's story was not reasonable.

*Jury deliberations and verdict*

The jury began its deliberations on the afternoon of July 10, 1995. On July 11, the jury requested to hear the testimony of appellant and Officer Gomez. The jury also submitted a written question: "Clarify 'not unlawful' aspect —4 points. Must all 4 points be agreed upon to find the defendant not guilty."

The court and the parties agreed the jury's questions referred to CALJIC No. 12.06. The parties agreed the court would again read CALJIC No. 12.06 to the jury, indicate that they were not sure of the jury's exact question, and ask the jury to submit a more explicit question.

The jury returned to the courtroom, and the court stated that the parties were uncertain as to their exact request. The court stated it would again read CALJIC No. 12.06, and asked the jury to be more specific if there were additional questions regarding this instruction.

The jury did not submit any more questions or requests. On the afternoon of July 12, the court informed the parties that the jury had reached a verdict. Appellant's counsel informed the court that he had an objection to CALJIC No. 12.06, particularly the phrase that the four requirements "must be met."

Counsel argued this language could possibly create the idea that appellant had the burden of proof as to those elements. Counsel stated he had no option but to request the instruction, but asserted such language might mislead the jury.

The court acknowledged the objection and brought the jury in for the verdict. Appellant was found guilty of felony possession of heroin.

Appellant filed a motion for new trial asserting CALJIC No. 12.06 confused the jury as to the burden of establishing his defense of lawful possession. The court determined the instruction was correct and denied the motion. The court relied on *People* v. *Fuentes* (1990) 224 Cal.App.3d 1041 [274 Cal.Rptr. 17], determined that appellant's theory of the case involved an affirmative defense, he had the burden to establish the elements of the affirmative defense, and the instruction was not misleading.

Appellant was sentenced to the third strike term of 25 years to life as to count I, possession of heroin, with a consecutive term of 90 days for count II, being under the influence, and a consecutive term of 2 years for the prior prison term enhancements.

On appeal, appellant raises several challenges to CALJIC No. 12.06. Appellant argues the instruction improperly shifted the burden of proof from the prosecution to the defense and failed to state the applicable burden of proving the elements of the defense of lawful possession of heroin for the purpose of disposal.

Appellant also challenges several other aspects of his conviction on appeal and filed a petition for writ of habeas corpus concerning the denial of his motion for new trial.

## DISCUSSION

### I.

*The Juror Affidavits Are Inadmissible\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.

*CALJIC No. 12.06*

Appellant contends CALJIC No. 12.06, which stated his theory of the case, improperly shifted the burden of proof or persuasion as to the elements

---

*See footnote, *ante*, page 1345.

of lawful possession for the purpose of disposal. In the alternative, appellant asserts that even if CALJIC No. 12.06 states an affirmative defense, the instruction failed to inform the jury of the correct burden of establishing such a defense. Appellant argues the absence of any guidance as to his burden of establishing the affirmative defense requires reversal of his conviction.

In addressing appellant's contentions, we will focus on the language of the instruction to determine (1) whether appellant's theory of lawful possession for the purpose of disposal constituted an affirmative defense, (2) the allocation and magnitude of the burden of establishing an affirmative defense, (3) whether CALJIC No. 12.06 properly set forth the applicable burden, and (4) the prejudicial nature of the alleged instructional error.

A. *Lawful possession for the purpose of disposal is an affirmative defense*

Appellant was charged with violating Health and Safety Code section 11350, subdivision (a), which provides: "Except as otherwise provided in this division, every person who possesses" specified controlled substances "unless upon the written prescription of a physician . . ." shall be punished by imprisonment.

Appellant's defense was that he possessed the heroin simply to dispose of it, and that such possession was not unlawful within the meaning of Health and Safety Code section 11350. This theory was based on *People* v. *Mijares* (1971) 6 Cal.3d 415 [99 Cal.Rptr. 139, 491 P.2d 1115]. In *Mijares*, a witness observed defendant lean into a car, remove an item, and throw it into a nearby field. Defendant returned to the car, drove to a fire station and asked for medical assistance because the passenger had overdosed on narcotics. The item in the field was subsequently identified as a handkerchief containing heroin and narcotics paraphernalia. The defendant was charged with possession of heroin. Defendant testified he was driving around and picked up his friend, who appeared drowsy. His friend became unconscious, and defendant was unable to revive him. Defendant checked his friend's pockets to determine if he used drugs, and found the narcotics and paraphernalia. Defendant threw it into the field and drove to the fire station for help. The trial court refused defendant's request for an instruction that if the jury believed he only had contact with the narcotics simply to remove it from his friend's pocket for the purpose of disposal, such handling was insufficient for a conviction of possession of heroin. (*Id.* at pp. 417-419.)

*Mijares* held that the act of handling narcotics for the sole purpose of disposal did not constitute unlawful possession within the meaning of the

offense, and reviewed similar state and federal cases. *Mijares* held that in throwing the heroin out of the car, defendant maintained momentary possession for the sole purpose of putting an end to his friend's unlawful possession. (6 Cal.3d at p. 420.) The Supreme Court noted an earlier case in which it ordered the trial court to permit the defendant "*as a defense to possession,* to introduce evidence concerning the fleeting purpose of his taking the narcotics outfit and casting it over the fence." (*Id.* at p. 421, italics added.) *Mijares* also noted an appellate decision which held that " '[e]ven if it be assumed that defendant's own explanation of his reasons for carrying the narcotic *constituted a defense,* the jury was not required to believe it.' " (*Ibid.,* italics added.)

*Mijares* also focused on the defendant's intent in handling the narcotics: "In a literal sense, defendant here physically controlled the narcotic when he removed it from the pockets of [his friend] and threw it away. The People contend such conduct is included within the 'dominion and control' test of possession. [Citations.] The latter definition, however, is primarily used to sustain a conviction of possession when the contraband is not in the actual possession of the defendant but within his reach, or in a place where he is storing it and where it is available to him for future use. For example, in [*People* v. *Redrick* (1961) 55 Cal.2d 282 [10 Cal.Rptr. 823, 359 P.2d 255]] we held that the circumstance of the defendant being recently in possession of the key to a storeroom in which heroin was found indicated he exercised sufficient dominion and control over the drug to support a conviction of unlawful possession. Thus if defendant Mijares had thrown the heroin out of the car with the intent of retrieving it later, he would not have been abandoning the contraband and his possession, albeit constructive, would have met the test of *Redrick*. There is, however, no evidence of the defendant's intent to return to the scene of abandonment. Indeed, his voluntary wait for the police to arrive at the fire station indicates a contrary intent." (6 Cal.3d at pp. 421-422.) The court found that under the prosecution's theory, the witness who observed defendant's activities would be guilty of possession of narcotics if she picked up the package in the field, identified the contents as narcotics, then placed it on the ground, "notwithstanding the fact that her transitory handling of the contraband might have been motivated solely by curiosity. We cannot read the possession statutes to authorize convictions under such guileless circumstances." (6 Cal.3d at p. 422.) *Mijares* concluded that under the circumstances of the case, the trial court had a sua sponte duty to instruct the jury "on the issue of momentary handling prior to abandonment since such an issue goes to the very essence of the offense. [¶] *The jury should have been instructed that the possession prohibited [by the statute] does not include merely handling for only brief moments prior to abandoning the narcotic.*" (*Id.* at p. 423, italics added.)

The *Mijares* theory was expanded in *People* v. *Cole* (1988) 202 Cal.App.3d 1439 [249 Cal.Rptr. 601] in which the court gave a special instruction based on *Mijares* that physically handling a controlled substance "for only brief moments" for the purpose of abandonment or disposal was insufficient evidence to convict defendant of possession. Defendant argued that possession of the narcotics for "only brief moments" was not the focus of *Mijares*, but the ultimate issue was his intent. (*People* v. *Cole, supra*, 202 Cal.App.3d at pp. 1443-1444.) The court agreed, and found that a "careful reading of *Mijares*" led to the conclusion "that its holding is not limited to possession for 'brief moments' only, but that possession of illegal drugs *solely for the purpose of disposal* does not constitute unlawful possession." (*People* v. *Cole, supra*, 202 Cal.App.3d at p. 1445.) *Cole* held that the "only brief moments" phrase of the special instruction improperly restricted defendant's "only defense," and the court should have tailored the instruction to defendant's theory of the case, which was supported by substantial evidence. (*Id.* at pp. 1445-1446.) *Cole* concluded that the defendant's actual time of possession was simply one of the factors to be considered. (*Id.* at p. 1447.)

*People* v. *Sullivan* (1989) 215 Cal.App.3d 1446 [264 Cal.Rptr. 284] rejected *Cole*'s extension of *Mijares* and held that the essential element of the defense is the defendant's "momentary" possession of the narcotics. "*Cole* complicates the [*Mijares*] rule by bringing in inquiries into the defendant's subjective intent in possessing the contraband. These inquiries are not suggested by *Mijares* or supported by the language of the statute. *Mijares's focus was on the fleeting nature of the possession (during the instant of abandonment), not on the subjective mental state of the defendant. The statute makes possession illegal without regard to the specific intent in possessing the substance. We conclude the Cole court misinterpreted the Mijares decision and erred in deleting the 'momentary' possession requirement.*" (*People* v. *Sullivan, supra*, 215 Cal.App.3d at p. 1452, italics added.)

The *Mijares* theory has been alternately described as the "disposal defense," the "momentary possession defense," and the "transitory possession" defense. (See *People* v. *Sullivan, supra*, 215 Cal.App.3d 1446, 1453; *People* v. *Hurtado* (1996) 47 Cal.App.4th 805, 810, 814 [54 Cal.Rptr.2d 853]; *People* v. *Pepper* (1996) 41 Cal.App.4th 1029, 1038 [48 Cal.Rptr.2d 877].) *Mijares* was the "impetus" for the drafting of CALJIC No. 12.06. This instruction was subsequently amended to contain alternative language as to the time element, conforming with either *Cole* or *Sullivan*. (*People* v. *Hurtado, supra*, 47 Cal.App.4th 805, 810-811.)

In the instant case, the trial court granted appellant's instructional request and gave the following pattern version of CALJIC No. 12.06 which follows *Cole*'s expansive discussion of the time element:

"The possession of a controlled substance is not unlawful *where all of the following conditions are met*:

"1. The possession is based on neither ownership nor the right to exercise control over the heroin,

"2. The heroin is possessed solely for the purpose of abandonment, disposal, or destruction,

"3. The heroin is possessed for the purpose of terminating the unlawful possession of it by another person or preventing another person from acquiring possession of it, and

"4. Control is not exercised over the heroin for the purpose of preventing its imminent seizure by law enforcement.

"Length of time of possession is one of the factors that may be considered in deciding whether the defendant physically handled the substance solely for abandonment, disposal, or destruction." (Italics added.)

Appellant's assignment of error is based on the language italicized above. Appellant asserts that such language improperly shifts the burden of proving lawful possession to the defense. Thus, the threshold issue is whether the *Mijares* theory and CALJIC No. 12.06 state an affirmative defense.

■ "It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant. [Citations.] . . . ' "[T]he question is whether the exception is so incorporated with, and becomes a part of the enactment, as to constitute a part of the definition, or description of the offense; for it is immaterial whether the exception or proviso be contained in the enacting clause or section, or be introduced in a different manner. It is the nature of the exception and not its location which determines the question. Neither does the question depend upon any distinction between the words 'provided' or 'except' as they may be used in the statute. In either case, the only inquiry arises, whether the matter excepted, or that which is contained in the proviso, is so incorporated with, as to become, in the manner above stated, a part of the enacting clause. If it is so incorporated, it shall be negatived, otherwise it is a matter of defense." ' *Thus, where exceptions or provisos are not descriptive of the offense, or define it, but rather afford a matter of excuse, 'they are to be relied on in [the] defense.'* [Citations.]" (*In re Andre R.* (1984) 158 Cal.App.3d 336, 341-342 [204 Cal.Rptr. 723], italics added, citing *Ex Parte Hornef* (1908) 154 Cal. 355, 360 [97 P. 891].)

"It is settled that the privilege of possessing a narcotic must be shown affirmatively by the defendant." (*People* v. *Marschalk* (1962) 206 Cal.App.2d 346, 349 [23 Cal.Rptr. 743].) In *People* v. *Fuentes, supra*, 224 Cal.App.3d 1044, the court reviewed the possible defenses to a violation of Business and Professions Code section 4149, which provides that possession of a needle or syringe is unlawful except when acquired pursuant to certain statutory conditions. The jury was instructed pursuant to CALJIC No. 16.005, that if the evidence established beyond a reasonable doubt the defendant possessed such a needle or syringe, the defendant then has the burden of raising a reasonable doubt that he unlawfully acquired such object. (*People* v. *Fuentes, supra*, 224 Cal.App.3d 1041, 1044.) The court interpreted section 4149 as allocating to the defendant the burden regarding lawful acquisition of a hypodermic needle.

" 'It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant. [Citations.]' [Citations.] Section 4149 does just that. It first defines the offense in unconditional terms: 'No person shall possess or have under his or her control any hypodermic needle or syringe . . . .' It then specifies an exception to its operation: 'except when acquired in accordance with the provisions of this article.' This formulation clearly establishes the Legislature's intent to provide that authorized possession is an affirmative defense that must be raised and proved by the accused. The jury instruction reflects the Legislature's intent and the statutory requirement." (224 Cal.App.3d at p. 1045.) *Fuentes* held that designation of authorized possession as an affirmative defense was consistent with the rule of necessity and convenience " 'which provides that the burden of proving an exonerating fact may be imposed on a defendant if its existence is "peculiarly" within his personal knowledge and proof of its nonexistence by the prosecution would be relatively difficult or inconvenient. Of course, this burden may not be unduly harsh or unfair. . . .' [Citations.]" (224 Cal.App.3d at p. 1045.) *Fuentes* concluded that it was not unduly harsh or unfair to place the burden of proving authorized possession on the defendant. "This is a fact peculiarly within defendant's personal knowledge and relatively difficult for the prosecutor to disprove." (*Id.* at p. 1046.) "Moreover, the designation of *authorized possession* of a hypodermic needle or syringe as an *affirmative defense* is in accord with the practice in other jurisdictions [citation] and corresponds to the practice in this state of imposing upon the accused the burden of showing lawful possession in similar cases. [Citations.]" (*Ibid.*, italics added.) The instruction simply informed the jury the defendant had the burden of proving his acquisition of the hypodermic needle was lawful. (*Id.* at p. 1047.)

*In re Andre R., supra*, 158 Cal.App.3d 336 interpreted Penal Code former section 12021.5, which provided in pertinent part that "[a] minor may not

possess a concealable firearm unless he or she has the written permission of his or her parent or guardian to have such firearm . . . ." The court held the prosecution was not required to prove the lack of a parent's written permission to carry a concealable firearm as an element of the crime under section 12021.5. (*In re Andre R., supra,* 158 Cal.App.3d at p. 341.) "Here, the existence of written parental permission does not define or describe the offense. The offense is the possession of a concealable firearm by a minor. Hence, written parental permission 'excuses' a minor from the sanctions imposed by section 12021.5 and must be raised as a defense by the accused." (158 Cal.App.3d at p. 342.)

In *People* v. *Martinez* (1953) 117 Cal.App.2d 701 [256 P.2d 1028], the court held that a written prescription from a licensed physician was a defense to a charge of possession of controlled substances in violation of Health and Safety Code section 11350. *Martinez* held it was up to the defendant to prove the existence of a prescription; the prosecution need not prove the nonexistence of a prescription. (*People* v. *Martinez, supra,* at p. 708.)

In *People* v. *George* (1994) 30 Cal.App.4th 262 [35 Cal.Rptr.2d 750], the court reviewed the elements of a violation of Penal Code section 4573.6, possession of narcotics or narcotics paraphernalia in prison without being authorized to so possess by specific prison or jail personnel. *George* held the lack of authorization to possess such substances in prison was not an element of the offense, but constituted a defense. *George* relied on *Andre R.* and *Martinez,* and concluded that ". . . the existence of a jail rule authorizing possession of a controlled substance or of specific authorization by the warden does not define or describe the offense at issue here. The offense is possession of a controlled substance in a jail facility by an inmate or visitor. Accordingly, a jail rule or specific authorization from a warden would excuse a defendant from the sanctions imposed by section 4573.6, but it must be raised as a defense by the accused. [Citations.]" (30 Cal.App.4th at pp. 275-276.)

*People* v. *Cardenas* (1997) 53 Cal.App.4th 240 [61 Cal.Rptr.2d 583] also reviewed Penal Code section 4573.6, and agreed with *George* that authorized possession is an affirmative defense rather than unauthorized possession being an element of the offense. "In addition to the sound rationale of *George,* common sense compels this result. Carried to its logical conclusion, appellant's argument would place a greater burden on the prosecution to prove drug possession committed inside prison walls than to prove that same crime committed outside. In other words, a person not in prison in possession of drugs could be convicted upon proof of possession without proof regarding lack of authorization. But to convict a prisoner the People would

have to prove lack of authorization. We cannot accept such anomalous results." (53 Cal.App.4th. at p. 246.)

■ The theory expressed in *Mijares* and CALJIC No. 12.06, possession for the purpose of disposal, constitutes an affirmative defense. Health and Safety Code section 11350 defines the offense of unlawful possession of designated controlled substances in unconditional terms, but also specifies exceptions to its operation. The Legislature created the express exceptions of legal possession "as otherwise provided in this division" and "upon the written prescription" of a physician. (Health & Saf. Code, § 11350, subd. (a).) *Mijares* crafted an additional exception of lawful possession for the purpose of abandonment, disposal, or destruction of the narcotics, which is unrelated to the statutory elements of the offense. *Cole*'s interpretation of *Mijares*, as articulated in CALJIC No. 12.06, thus operates to establish a legal excuse to possess the narcotics for such a purpose. It follows from *Fuentes*, *Marschalk*, *Andre R.*, and *George* that lawful possession of narcotics for the purpose of abandonment, disposal, or destruction is an affirmative defense to be established by the defendant.

B. *Appellant's burden to establish an affirmative defense*

The next question is the nature of appellant's burden to establish the affirmative defense of possession of narcotics for the purpose of disposal. Appellant asserts CALJIC No. 12.06 failed to set forth the appropriate burden of proof. Appellant argues the jury was not properly instructed as to his burden of establishing this defense, and the language of the instruction, which simply provides the stated conditions must be "met," was insufficient.

■ The trial court is required to instruct the jury on both the assignment and the magnitude of burdens of proof. (*People* v. *Figueroa* (1986) 41 Cal.3d 714, 721 [224 Cal.Rptr. 719, 715 P.2d 680]; Evid. Code, § 502.) ■ The due process clause of the federal Constitution requires the People to prove every element of a criminal charge beyond a reasonable doubt. (*Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 685 [95 S.Ct. 1881, 1883, 44 L.Ed.2d 508]; *In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 1072-1073, 25 L.Ed.2d 368]; *People* v. *Bolden* (1990) 217 Cal.App.3d 1591, 1660 [266 Cal.Rptr. 724].) However, the due process clause does not invalidate every instance of burdening the defendant with proving an exculpatory fact. (*Patterson* v. *New York* (1977) 432 U.S. 197, 203, fn. 9 [97 S.Ct. 2319, 2323, 53 L.Ed.2d 281]; *People* v. *Bolden, supra*, 217 Cal.App.3d at p. 1600.)

"A state may allocate the burden of persuasion to a criminal defendant through the device of an affirmative defense. The United States Supreme

Court has afforded the states wide latitude in designating affirmative defenses. [Citation.] In *Patterson* v. *New York* (1977) 432 U.S. 197 . . . , for example, the court approved a New York law requiring the accused in a prosecution for second degree murder to prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance in order to reduce the charge to manslaughter. The court observed: 'To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate. [¶] We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused.' [Citations.]" (*People* v. *Fuentes, supra,* 224 Cal.App.3d 1041, 1044-1045.)

In *People* v. *Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335], the Supreme Court discussed the degrees of burdens of proof which may be placed on a defendant in a criminal case. "[W]hen there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue." (*Id.* at p. 963.) "There are, however, other instances of defenses asserted by an accused which raise factual issues collateral to the question of the accused's guilt or innocence and do not bear directly on any link in the chain of proof of any element of the crime. Among such defenses are those which raise no challenge to the sufficiency of the prosecution's proof of any element of the crime charged but for reasons of public policy insulate the accused notwithstanding the question of his guilt. [Citation.] Entrapment is one of such public policy defenses [citation] and the collateral question whether an accused was entrapped must be proved by him by a preponderance of the evidence." (*Id.* at p. 964.)

" 'On any issue of defendant's guilt that is in the nature of an affirmative defense, the burden of proof assigned to defendant shall be merely to raise a reasonable doubt as to his guilt; . . . [o]n a guilt issue other than whether defendant committed the criminal acts charged, the burden of proof assigned to defendant may be fixed at proof by a preponderance of the evidence.' [Citation.]" (*People* v. *Figueroa, supra,* 41 Cal.3d 714, 722.)

It is constitutional to require a criminal defendant to bear the burden of proving an affirmative defense by a preponderance of the evidence. (*Martin* v. *Ohio* (1987) 480 U.S. 228, 233-234 [107 S.Ct. 1098, 1101-1102, 94 L.Ed.2d 267]; *People* v. *Bolden, supra,* 217 Cal.App.3d at p. 1601.) "In this

context, an affirmative defense is one which presumes the prima facie elements of the crime are true, but exculpates the defendant because of excuse or justification. [Citations.] Stated another way, in this context an affirmative defense is one which does not negate any element of the crime, but is new matter which excuses or justifies conduct which would otherwise lead to criminal responsibility. For example, necessity is a defense which admits, for the sake of argument, the elements of the charged offense, but offers a justification to avoid criminal culpability. As such, it is an affirmative defense which the defendant must prove by a preponderance of the evidence." (*People* v. *Bolden, supra,* 217 Cal.App.3d at p. 1601; see also *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1008-1010 [138 Cal.Rptr. 515].)

■ When a defendant relies on the *Mijares* defense, he or she essentially admits the commission of the offense of simple possession of narcotics: The defendant exercised control over the narcotics, he or she knew of its nature and presence, and possessed a usable amount. (CALJIC No. 12.00.) However, the defendant additionally asserts that he or she possessed the narcotics for the limited purpose of disposal, abandonment, or destruction. *Mijares* does not serve to negate an element of the offense of possession of narcotics. Instead, it offers a judicially created exception of lawful possession under certain specific circumstances as a matter of public policy, similar to the defenses of entrapment and necessity. It involves facts peculiarly within the defendant's personal knowledge and relatively difficult for the prosecutor to disprove. (*People* v. *Fuentes, supra,* 224 Cal.App.3d at p. 1046.) As such, the defendant has the burden of proving the existence of this defense by a preponderance of the evidence, and the assignment of this burden does not violate the due process clause of the Constitution. (*People* v. *Tewksbury, supra,* 15 Cal.3d at p. 964; *People* v. *Figueroa, supra,* 41 Cal.3d at p. 722; *People* v. *Bolden, supra,* 217 Cal.App.3d at p. 1601.)

C. *The adequacy of the jury instruction*

We have determined the defendant bears the burden of establishing the *Mijares* defense of possession for the purpose of disposal by a preponderance of the evidence. We now turn to CALJIC No. 12.06 to determine whether the instruction correctly set forth the allocation and magnitude of the requisite burden of proof.

CALJIC No. 12.06 correctly states the elements of the *Mijares* defense of lawful possession of narcotics: The defendant's possession must be momentary; the narcotics must be possessed solely for the purpose of abandonment, disposal, or destruction; the narcotics must be possessed for the purpose of

terminating another person's unlawful possession; and control is not exercised over the narcotics to prevent its imminent seizure by law enforcement. The instruction also contains *Cole's* expansive language concerning length of time of possession as another variable factor.

The instruction additionally provides possession of a controlled substance is not unlawful where all four stated conditions "are met." The instruction does not offer further guidance as to *which* party must meet the four conditions, and the *burden* which that party must meet to establish all of the conditions in order for the jury to find the defendant's possession was not unlawful and thus find defendant not guilty. In reviewing the entirety of the instructions, we note the jury did not receive any other instruction concerning the allocation and magnitude of the burden of proof aside from the standard instruction of CALJIC No. 2.90 stating the prosecution's burden of proving the offense beyond a reasonable doubt.

In contrast, CALJIC No. 4.43 states the elements of the affirmative defense of necessity, and provides: "A person is not guilty of a crime when [he] [she] engages in an act, otherwise criminal, through necessity. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the elements of this defense . . . ." Similarly, CALJIC No. 4.60 states the elements of the affirmative defense of entrapment, and provides: "To establish this defense the defendant has the burden of proving by a preponderance of the evidence that the conduct of the law enforcement agents or officers . . . would likely induce a normally law-abiding person to commit the crime." The Use Notes for both CALJIC Nos. 4.43 and 4.60 direct the court to define "preponderance of the evidence" pursuant to CALJIC No. 2.50.2. The language of these instructions informs the jury of the allocation and magnitude of the defendant's burden of establishing the affirmative defenses.

While the jury in the instant case was correctly instructed as to the elements of the *Mijares* defense, the instructions were incomplete in their failure to identify which party had the burden of meeting the four conditions, and the level of the burden required to establish the conditions. The jury could reasonably infer appellant had the burden of meeting the conditions, given the nature of the defense. However, the jury received absolutely no guidance as to the magnitude of appellant's burden. The jury should have received an additional instruction defining the allocation and magnitude of the burden of proving the defense, such as the following example: "A person is not guilty of a crime when his or her possession of a controlled substance is shown to be lawful. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish that his

or her possession of a controlled substance is not unlawful." The jury could have then received CALJIC No. 12.06, followed by the definition of "preponderance of the evidence" pursuant to CALJIC No. 2.50.2:

" 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it.

"You should consider all of the evidence bearing upon every issue regardless of who produced it." Such language clearly sets forth the burden of establishing the affirmative defense of possession of narcotics for the purpose of disposal. The instructions in the instant case were deficient in their complete failure to inform the jury of these crucial considerations.

### D.  *Prejudice*

The final question is whether the failure of the instruction to define the magnitude of appellant's burden of proving the affirmative defense requires reversal of appellant's conviction for possession of heroin. The error is of constitutional dimension, and we must determine whether the instructional error is harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People* v. *Tewksbury, supra,* 15 Cal.3d at pp. 963-964; *People* v. *Dewberry* (1992) 8 Cal.App.4th 1017, 1021-1022 [10 Cal.Rptr.2d 800].)

The prosecution's case was strong, given appellant's admitted heroin addiction and his use of heroin and PCP, in addition to his possession of heroin. Appellant's defense, however, was equally strong based on the testimony concerning the methadone clinic and his withdrawal symptoms, his dialogue with the 911 operator, and the testimony of his girlfriend and the overdose victim. The evidentiary flaw in appellant's case involved the failure of appellant, his girlfriend, and the overdose victim to initially inform the police that appellant took the heroin balloon from Allen and possessed it simply to destroy it as soon as Allen left his residence. This flaw, however, created a credibility issue for the jury given the explanations offered by the defense witnesses for their failure in reporting appellant's conduct.

In addition, we note the record reflects the jury's difficulty with the instructions based on the jury's question during deliberations specifically focusing on the incomplete language of CALJIC No. 12.06. It is entirely

possible the jury applied a burden of proof substantially different in nature than appellant's limited constitutional burden of establishing his defense by a preponderance of the evidence.

Given the state of the evidence and the deficiencies in CALJIC No. 12.06, the instructional error is prejudicial and requires reversal of appellant's conviction. The defense theory was properly defined by CALJIC No. 12.06, but the jury was not expressly informed as to which party had the burden of proving the conditions were "met" and, critically, the level of proof required to "meet" the conditions. Thus, the court's failure to properly instruct the jury is not harmless beyond a reasonable doubt, and appellant's conviction for possession of narcotics must be reversed.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed and the matter remanded to the trial court for further appropriate proceedings.

The petition for writ of habeas corpus is denied.

Stone (W. A.), Acting P. J., and Thaxter, J., concurred.

---

*See footnote, *ante*, page 1345.